231 P.3d 1241 (2010)
155 Wash.App. 151
Karen CARLTON and Marjorie Holland, co-administrators/personal representatives for the Estate of Miriam Elizabeth Carlton, Appellants,
v.
VANCOUVER CARE LLC, d/b/a Stonebridge Memory Care, Respondent.
No. 36797-1-II.
Court of Appeals of Washington, Division 2.
March 16, 2010.
As Amended June 22, 2010.
*1243 William Henry Reed, Reed Johnson & Snider PC, Vancouver, WA, for Appellants.
Douglas Fredrick Foley, Douglas Foley & Associates, PLLC, Vancouver, WA, Barbara J. Duffy, Ryan P. McBride, Andrew Gordon Yates, Lane Powell PC, Seattle, WA, for Respondent.
ARMSTRONG, J.
¶ 1 Miriam Carlton, an elderly woman who suffered from severe dementia, was living in Stonebridge Memory Care when a male patient sexually assaulted her. Carlton died 13 months later without ever being able to describe the assault or its effect on her. Karen Carlton and Marjorie Holland, personal representatives of Carlton's estate, sued Vancouver Care LLC, which operates Stonebridge, for negligence and abuse of a vulnerable adult under chapter 74.34 RCW. To prove that the rape caused Carlton to suffer emotional harm, the Estate retained Dr. Ann Burgess, a psychiatric nurse, to testify about implicit and explicit memory, conditioned fear response, rape trauma syndrome, and compounded rape trauma syndrome. Stonebridge moved to exclude the proposed testimony, arguing that rape trauma syndrome was not a generally accepted diagnosis by experts in the field. The trial court granted the motion, ruling that the Estate could not present testimony about the diagnosis because it was not recognized by the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV).[1] We accepted discretionary review of the trial court's order excluding the proposed expert testimony, and we now reverse.

FACTS
¶ 2 Miriam Carlton suffered from severe dementia. She had limited language skills, could not carry on a conversation, and could make only one or two word responses to questions. Carlton also preferred lying and sleeping on the floor. She knew her name but was unaware of place or time.
¶ 3 One day, a male resident at Stonebridge inserted his fingers in Carlton's rectum and vagina. Carlton was transported to the emergency room where her vital signs were elevated and she was in mild distress. She was mumbling incoherently, but said at one point, "What did I do wrong?" 1 Report of Proceedings (RP) at 51, 53.
¶ 4 Carlton returned to Stonebridge for nine days before her daughters transferred her to Canyon Creek Assisted Living & Memory Care. During those nine days, Stonebridge staff recorded that Carlton returned *1244 to her "base line" condition and showed no apparent distress, though she slept for extended periods of time in the fetal position. Supp. Clerk's Papers (SCP) at 251-52; 1 RP at 52. At Canyon Creek, Carlton's condition deteriorated. She had to use a wheelchair much of the time and became so agitated when staff attempted to change her underwear or provide "peri-care" that staff had to sedate her with anti-psychotic drugs. 1 RP at 52, 145-46. Carlton was never tested for any psychological disorders and died about 13 months after the rape.
¶ 5 The Estate sued Stonebridge for negligence and violation of Washington's Vulnerable Adult Statute, chapter 74.34 RCW. The Estate alleged that Carlton sustained physical injury, pain, suffering, mental anguish, and emotional distress as a result of the rape. Stonebridge admitted responsibility for the assault but denied that it harmed Carlton.
¶ 6 Before trial, Stonebridge moved to exclude expert testimony by Dr. Burgess regarding rape trauma syndrome, compounded rape trauma syndrome, and implicit memory. The Estate argued that it needed Dr. Burgess's testimony to prove Carlton's emotional injuries. The trial court held a Frye[2] hearing to address whether the concepts of rape trauma syndrome and implicit memory were generally accepted by the scientific community.

A. Scientific Theories and Principles

1. Rape Trauma Syndrome
¶ 7 Dr. Burgess is a professor of psychiatric nursing with a doctorate in nursing science and psychiatric nursing and 40 years of experience in practice and academia. Her research has focused on sexual assault victims, including elderly victims. She has authored or co-authored a wide variety of publications, including the initial 1974 work on rape trauma syndrome. See Ann Wolbert Burgess and Lynda Holmstrom, Rape Trauma Syndrome, 131 Am. J. Psychiatry 981 (1974).
¶ 8 According to Dr. Burgess, rape trauma syndrome is a "clustering" of signs and symptoms experienced by adult rape victims. 1 RP at 23. Rape victims experience a two-phased reaction to rape: an "acute," "disruptive," or "disorganization" phase that disrupts their daily lives, and a "reorganization phase." 1 RP at 23; 2 RP at 212. "Compounded" rape trauma syndrome means that the patient has an additional factor, such as dementia or mental retardation, that prevents the use of normal tools to assess the trauma and develop a treatment plan. 1 RP at 31-32.
¶ 9 Dr. Burgess testified that rape trauma syndrome is now a "nursing diagnosis" that helps mental health professionals design and implement treatment for rape victims. 1 RP at 24, 105. She testified that in her initial 1974 study, she did not assume the victim had been raped; rather, she determined there was a rape from the victim's symptoms.
¶ 10 Dr. Christopher Johnson, a licensed psychologist who treats victims of sexual assault, testified that most mental health professionals are familiar with rape trauma syndrome. He acknowledged that many of the behaviors associated with rape victims do not fit within the full definitions of DSM-IV diagnoses such as anxiety, acute distress, or post-traumatic stress disorder. Rape trauma syndrome relates more to the phases by which victims recover from rape than to the actual psychological harm the victim experienced.
¶ 11 Post-traumatic stress disorder is the nearest medical diagnosis to rape trauma syndrome. Post-traumatic stress disorder is recognized in the DSM-IV; rape trauma syndrome is not. Dr. Burgess testified that rape trauma syndrome is now a "sub-group" of post-traumatic stress disorder. 1 RP at 24. Dr. Robert Olsen, a physician specializing in general and forensic psychiatry, testified that it is well established that *1245 rape victims have a very high probability of developing post-traumatic stress disorder after a rape.
¶ 12 Stonebridge presented testimony from two experts. Dr. Walter Hinton, an associate professor of psychiatry who specializes in late-life disorders, testified that the psychiatric community generally accepts only those medical diagnoses listed in the DSM-IV. He also stated that Dr. Burgess's original rape trauma syndrome paper is "limited methodologically" and that rape trauma syndrome has never been even a provisional diagnosis under the DSM-IV. 2 RP at 238, 244.
¶ 13 Dr. Deana Klein, a psychiatrist, testified that rape trauma syndrome is not generally accepted as a valid scientific theory on any basis, diagnostic, therapeutic, or otherwise. She had never heard of it before this case. She did acknowledge, however, that rape is a trauma that can lead to anxiety, post-traumatic stress disorder, and conditioned fear response.

2. Implicit Memory
¶ 14 Dr. Burgess testified that people have two different memory systems: explicit and implicit. Explicit memory is the content of what we know and remember and is cognitively based.[3] The implicit system is sensory-based and creates "conditioned response[s]" similar to instinctual behaviors in the animal world. 1 RP at 17-19. The implicit memory system has nothing to do with DSM-IV because it is just a basic structural explanation of how memory works. This structural understanding of implicit and explicit memory systems has been generally accepted in the scientific community since the 1890s. Dr. Olsen agreed that the concept of implicit memory is accepted within the medical community and can be demonstrated in people under anesthesia. Even a person who cannot form cognitive memories retains the ability to store implicit memories.
¶ 15 Dr. Hinton expressly acknowledged the concepts of implicit and explicit memory and identified the parts of the brain that correspond to each function. Although Dr. Klein testified that the phrases "explicit and implicit memory systems" are considered "junk science," she acknowledged the validity of conditioned responses, or reactions associated with a particular event. 2 RP at 308-11.

B. Scientific Opinions About This Case

¶ 16 The Estate seeks to use Dr. Burgess's testimony to establish that Carlton (1) experienced the rape as a traumatic event and (2) suffered continued emotional distress in the months afterward.

1. Did Carlton Experience the Rape Itself as Traumatic?
¶ 17 Based on their review of Carlton's medical records, Drs. Burgess and Olsen opined that Carlton was traumatized immediately after the rape. Both relied first on Carlton's elevated vital signs to conclude that it had been a "distressing event" for her. 1 RP at 45, 145. Dr. Burgess also connected Carlton's behaviors to behaviors she had seen in other rape victims. For instance, Carlton's incoherent mumbling at the emergency room and at Stonebridge was consistent with "the need to talk" witnessed in sexually abused elders. And her statement "what did I do wrong?" was consistent with other elders who blamed themselves after a sexual assault. 1 RP at 51, 53-54. She also opined that Carlton's sleep patterns following the rape were consistent with a form of psychological shock she had witnessed in other elders.
¶ 18 On the other hand, Stonebridge's experts testified that none of the facts on which Drs. Burgess and Olsen relied could be reliably traced back to the rape given Carlton's severe dementia. Dr. Klein testified that vital signs are not reliable to diagnose a person's thought processes. Because the vital signs were recorded more than an hour after the rape and had so many other possible *1246 causes, they were not helpful. Dr. Klein thus testified that she was not sure whether Carlton experienced the event as a rape.

2. Did Carlton Have Continuing Emotional Distress As a Result of the Rape?
¶ 19 Dr. Olsen testified that he believed Carlton sustained ongoing emotional or psychological harm from the rape. Dr. Olsen relied on four facts: (1) Carlton's elevated vital signs at the emergency room because research with other types of traumas showed that sustained elevated heart rate is one of the best predictors of later post-traumatic stress disorder; (2) changes in behavior described by Carlton's daughter, including curling up into a ball;[4] (3) staff reports of increased and very marked agitation at Canyon Creek; and (4) arousal and extreme agitation when the staff attempted to change her underwear or do any peri-care. Dr. Olsen testified that these reactions, particularly the last one, were based on Carlton's implicit memories of the rape.
¶ 20 Dr. Hinton testified that Carlton's behaviors afterwards could have alternative explanations. Indeed, Carlton had resisted care in the pelvic region before and had been treated for depression in 1995, so her behavioral problems may have existed before the rape. The move to a new facility also may have upset her, as had her move to Stonebridge several years earlier. Overall, Drs. Hinton and Klein testified that there were insufficient facts to opine on the causes of Carlton's agitation at Canyon Creek.

C. Trial Court's Ruling

¶ 21 After the Frye hearing, the trial court ruled:
1. Based upon the 2003 article written by Dr. Brent Trowbridge in the Seattle University Law Review,[5] the Frye standard requires a DSM IV TR diagnosis in order to give an opinion on any harm Mrs. Car[l]ton may have suffered. Mrs. Carlton was never tested, so no diagnosis was ever made. Rape Trauma Syndrome is a syndrome under PTSD, not a separate DSM IV TR diagnosis.
2. Mrs. Carlton was severely demented. Accurate information could not be obtained to make a diagnosis under the DSM IV TR. Interpretation of behaviors does not rise to the Frye standard of DSM IV TR diagnosis.
3. Under ER 702, the evidence of Mrs. Carlton's subsequent behaviors is not relevant and not helpful.
Based upon the above findings, it is hereby ORDERED:
1. Plaintiffs may not introduce evidence of Rape Trauma Syndrome, Compounded Rape Trauma Syndrome, implicit memory or conditioned fear response.
2. Dr. Ann Burgess may not testify about her observations in similar populations.
CP at 55.

ANALYSIS
¶ 22 To be admissible, new scientific evidence must satisfy the standard for admissibility under Frye, as well as ER 702. State v. Gregory, 158 Wash.2d 759, 829, 147 P.3d 1201 (2006). A Frye analysis need not be undertaken, however, with respect to evidence that does not involve new methods of proof or new scientific principles from which conclusions are drawn. State v. Russell, 125 Wash.2d 24, 69, 882 P.2d 747 (1994). We review a trial court's Frye ruling de novo. In re Det. of Halgren, 156 Wash.2d 795, 802-03, 132 P.3d 714 (2006).
¶ 23 ER 702 allows qualified experts to testify regarding "scientific, technical, *1247 or other specialized knowledge" if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury. State v. Thomas, 123 Wash.App. 771, 778, 98 P.3d 1258 (2004); State v. Farr-Lenzini, 93 Wash.App. 453, 461, 970 P.2d 313 (1999). We review a trial court's ER 702 ruling for an abuse of discretion. State v. Greene, 139 Wash.2d 64, 70, 984 P.2d 1024 (1999).

I. Rape Trauma Syndrome
¶ 24 The Estate argues that the trial court erred in excluding expert testimony regarding rape trauma syndrome and compounded rape trauma syndrome because these syndromes are generally accepted in the community of mental health care providers and are helpful in understanding Carlton's behaviors, or lack of behaviors, after the rape. The Estate further asserts that courts have allowed this testimony when not offered as a direct assessment of the victim's credibility. Stonebridge responds that rape trauma syndrome testimony is precluded by State v. Black, 109 Wash.2d 336, 745 P.2d 12 (1987).

A. State v. Black

¶ 25 In Black, the issue was whether "rape trauma syndrome has been generally established as a scientifically reliable means of proving that a rape occurred." Black, 109 Wash.2d at 342, 745 P.2d 12. The court concluded that it had not, noting that several authors had criticized the methodology of rape trauma syndrome studies, and that the literature established that there was no typical rape response. Black, 109 Wash.2d at 343, 745 P.2d 12. In fact, the symptoms associated with rape trauma syndrome included two "directly conflicting emotional manifestations which are referred to as `styles,'" one outwardly emotional, and the other calm, composed, and subdued. Black, 109 Wash.2d at 344, 745 P.2d 12. The court concluded that because the syndrome's symptoms "embrace such a broad spectrum of human behavior, the syndrome provides a highly questionable means of identifying victims of rape." Black, 109 Wash.2d at 344, 745 P.2d 12.
¶ 26 The Black court also found the rape trauma syndrome testimony unfairly prejudicial because it expressed an opinion as to the defendant's guilt, thereby invading the jury's exclusive province. Black, 109 Wash.2d at 348, 745 P.2d 12. The prejudice from such testimony is especially acute where an expert, who carries "an aura of special reliability and trustworthiness," uses the term "rape trauma syndrome" because it "`connotes rape.'" Black, 109 Wash.2d at 349, 745 P.2d 12 (quoting State v. Saldana, 324 N.W.2d 227, 230 (Minn.1982), and State v. Taylor, 663 S.W.2d 235, 241 (Mo.1984)).
¶ 27 Black is not helpful here because it expressly refused to consider whether the scientific community generally accepted the premise that the symptoms encompassed by rape trauma syndrome are a common reaction to sexual assault. Black, 109 Wash.2d at 346, 745 P.2d 12. In Black, the issue was not whether rape victims display certain symptoms. Rather, the issue was whether the presence of certain symptoms, described as rape trauma syndrome, was a scientifically reliable method of proving rape.
¶ 28 Similarly, the law review article on which the trial court depended so heavily in both its oral and written rulings was aimed at exploring the legal and scientific validity of various syndromes purporting to show whether or not a crime such as rape likely occurred. Trowbridge, 27 Seattle U.L.Rev. at 454. Courts that do not admit rape trauma syndrome evidence usually believe that it is being offered to prove that rape occurred. Trowbridge, 27 Seattle U.L.Rev. at 463. The article concluded that while rape trauma syndrome may be helpful in understanding the trauma process, it is not helpful in diagnosing rape. Trowbridge, 27 Seattle U.L.Rev. at 521.
¶ 29 There is no need for any such diagnosis here: Stonebridge has admitted the rape. *1248 The issue in this case is whether the rape caused Carlton psychological harm. As many courts have realized, rape trauma syndrome evidence is admissible to help explain the trauma process and the manner in which a victim reacts to rape.

B. Washington Cases Admitting Syndrome Evidence

¶ 30 Division One of this court allowed an expert to testify about common symptoms associated with sexual abuse in State v. Stevens, 58 Wash.App. 478, 496, 794 P.2d 38 (1990). The court observed that Washington cases since Black had made clear that expert testimony generally describing symptoms exhibited by sexual abuse victims may be admissible when relevant and when not offered as a direct assessment of the victim's credibility. Stevens, 58 Wash.App. at 496, 794 P.2d 38. As an example, the court cited the Supreme Court's approval of expert testimony describing the symptoms of battered women syndrome in State v. Ciskie, 110 Wash.2d 263, 279-80, 751 P.2d 1165 (1988). This evidence was helpful to the jury's understanding of a matter outside the competence of an ordinary layperson and admissible to rebut testimony that the victim's behavior was inconsistent with that of a rape victim. Ciskie, 110 Wash.2d at 278-79, 751 P.2d 1165.
¶ 31 In another Division One decision, the court admitted general testimony concerning the "recantation phenomenon" to explain why the complaining witness in a child sexual abuse case had recanted before trial. State v. Madison, 53 Wash.App. 754, 764, 770 P.2d 662 (1989). The court distinguished Black on the basis that the evidence in Madison was not offered to prove that rape had occurred. Madison, 53 Wash.App. at 765, 770 P.2d 662. Similarly, expert testimony regarding rape trauma syndrome was admitted not to prove that abuse occurred, but to explain that the victim's delay in reporting the abuse was not inconsistent with her allegations in State v. Graham, 59 Wash.App. 418, 423-24, 798 P.2d 314 (1990). See also State v. Cleveland, 58 Wash.App. 634, 646, 794 P.2d 546 (1990) (therapist's testimony regarding typical behaviors of child victims of sexual abuse was admissible to aid jury in evaluating victim's testimony).

C. Civil Decisions Admitting Rape Trauma Syndrome Evidence

¶ 32 The New York Court of Appeals also held that rape trauma syndrome evidence is admissible to explain a rape victim's reaction to her attack in People v. Taylor, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 58 U.S.L.W. 2514 (1990). Although the court agreed with Black that the helpfulness of such evidence would be outweighed by the possibility of undue prejudice where it was introduced solely to prove that rape occurred, it emphasized that "the therapeutic nature of the syndrome does not preclude its admission into evidence under all circumstances." Taylor, 552 N.Y.S.2d 883, 552 N.E.2d at 139. A New York court then considered whether rape trauma syndrome testimony was admissible in a civil action to recover for personal injury. Gutierrez v. Iulo, 156 Misc.2d 79, 591 N.Y.S.2d 711 (N.Y.Sup.1992). In Gutierrez, the plaintiff wished to offer testimony on rape trauma syndrome to explain her "continuing sequelae which persist to this day." Gutierrez, 591 N.Y.S.2d at 713. The court determined that the expert would be permitted to testify "about [rape trauma syndrome] in general, and to give an opinion, based on the hospital records and an appropriate hypothetical, that the plaintiff's symptoms are consistent with RTS." Gutierrez, 591 N.Y.S.2d at 714-15. The court referred to Taylor in concluding that
[t]he same reasoning necessary to insure that victims of sexual assault are given a fair hearing in the criminal justice system requires that their accounts of injury and the psychic and emotional damage done to them be given an equally understanding and informed hearing when they seek recompense in our civil courts.
Gutierrez, 591 N.Y.S.2d at 715.
¶ 33 In another suit for damages caused by rape, a Massachusetts court allowed Dr. Burgess *1249 to testify about rape trauma syndrome and the manner in which victims react psychologically to being raped. Terrio v. McDonough, 16 Mass.App. 163, 450 N.E.2d 190 (1983). "This was not testimony which purported to state a specific conclusion on the basis of a scientific procedure such as a blood test on a person or a test of tensile strength on a material.... Dr. Burgess did not testify that [the plaintiff] had, in fact, been raped." Terrio, 450 N.E.2d at 198.[6] The court found no error in admitting testimony to the general effect that medical science recognized rape trauma syndrome and that certain kinds of conduct would be consistent with the syndrome, and it concluded that Dr. Burgess's testimony constituted specialized knowledge "which held promise of assisting the jury in understanding the evidence." Terrio, 450 N.E.2d at 198.
¶ 34 A Louisiana Court of Appeals affirmed a damages award based in part on the trial court's consideration of rape trauma syndrome in Alphonso v. Charity Hospital, 413 So.2d 982 (La.App.1982). The victim had sued a hospital after she sustained two rapes in its psychiatric ward, and the trial court found that her symptoms of rape trauma syndrome supported an award of $50,000 in damages. Alphonso, 413 So.2d at 987. Similarly, evidence of rape trauma syndrome was admissible and relevant to show "the nature of the trauma suffered by a rape victim, and factors that may aid or retard recovery" in Division of Corrections v. Wynn, 438 So.2d 446, 448 (Fla.App. 1 Dist.1983). The appellate court affirmed the jury's award of damages to a plaintiff raped by a work release inmate.
¶ 35 Although the $2 million award was ultimately vacated on other grounds, a plaintiff presented a psychiatrist with expertise in rape trauma syndrome during a damages hearing in Bagley v. Monticello Insurance Co., 430 Mass. 454, 720 N.E.2d 813 (1999). Rape victims received only nominal damages, however, where the expert testimony concerning rape trauma syndrome was insufficient to show that the plaintiffs were damaged. Butler v. Dowd, 979 F.2d 661, 671-72 (8th Cir.1992). The relevant testimony consisted solely of the expert's statement that "[t]here can be what's generally described as the rape trauma syndrome, which includes emotional, cognitive and psychological consequences." Butler, 979 F.2d at 672 n. 14.
¶ 36 A federal district court ruled that a medical behavioral scientist was qualified to testify about the links between rape trauma and its medical complications (whether physiological, psychological, or behavioral) in Redmond v. Baxley, 475 F.Supp. 1111, 1122 (D.C.Mich.1979). Finally, another federal district court accepted the plaintiff's argument that rape trauma syndrome prevented her from bringing a timely complaint against a cruise line after crew members raped her, and the court denied the cruise line's motion for summary judgment based on her untimely claim. Rugo v. Bermuda Star Line, Inc., 741 F.Supp. 1013, 1015 (D.Mass.1990).
¶ 37 None of the civil cases cited above prefaced its discussion of rape trauma syndrome evidence with an analysis of the Frye standard. At issue in these cases was whether expert testimony was admissible to prove, with a reasonable degree of certainty or medical probability, that the plaintiff was exhibiting symptoms attributable to the rape he or she had experienced. See Butler, 979 F.2d at 671-72 (record was bereft of any medical testimony based on reasonable medical probability); Rugo, 741 F.Supp. at 1015 (psychologist stated, "within a reasonable degree of certainty," that plaintiff suffered from rape trauma syndrome). This is all that is required in a civil case. See In re Det. of Twining, 77 Wash.App. 882, 891, 894 P.2d 1331 (1995) (expert medical or psychological opinion regarding causation of condition is inadmissible unless the expert holds his or her opinion with reasonable medical or psychological certainty). The necessary degree *1250 of certainty is established if the expert can testify that his or her opinion regarding causation is more probable than not. Bruns v. PACCAR, Inc., 77 Wash.App. 201, 215, 890 P.2d 469 (1995). The only threshold test for admissibility of rape trauma syndrome evidence in a civil case comes from ER 702.

D. ER 702

¶ 38 Under ER 702, scientific evidence is admissible if it is helpful to the trier of fact under the facts of the specific case. Greene, 139 Wash.2d at 73, 984 P.2d 1024. The Estate sought to prove that Carlton suffered emotional distress in the form of agitation, distress, and fear during peri-care before her death. Dr. Burgess opined that because these "avoidance" symptoms were consistent with those commonly suffered by other rape victims with dementia, they were more likely than not caused by the rape. 1 RP at 36, 38.

1. Opinion on Ultimate Issue
¶ 39 The trial court was concerned that here, as in Black, the rape trauma syndrome evidence would be used to prove the ultimate fact in the case. As stated, the Black court held that it would unfairly prejudice the defendant to admit expert testimony on rape trauma syndrome because it would constitute an opinion as to the defendant's guilt. Black, 109 Wash.2d at 348, 745 P.2d 12. No witness may express an opinion that is a conclusion of law or that tells the jury what result to reach. Tortes v. King County, 119 Wash.App. 1, 12, 84 P.3d 252 (2003); 5B Karl B. Tegland, Washington Practice: Evidence Law & Practice §§ 704.5, 704.6 (5th ed.2007). On any other issue, however, ER 704 explicitly provides that "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Thus, the prohibition on "ultimate facts" testimony does not prevent Dr. Burgess from testifying as to the ultimate factual issue of causation. See Davis v. Baugh Indus. Contractors, Inc., 159 Wash.2d 413, 420-21, 150 P.3d 545 (2007) (expert opinions that help establish the elements of negligence are admissible); 5B Tegland, supra § 704.2 ("a witness may testify that ... the defendant in a civil case was or was not responsible for the plaintiff's injuries").

2. Reliability of Application in this Case
¶ 40 Stonebridge also argues that Dr. Burgess's rape trauma syndrome diagnosis testimony is not helpful to the jury because there is no "precise" or "scientific" way to determine or measure the impact of the rape on Carlton given her dementia. Br. of Resp't at 19. But this argument fails to recognize that the Estate does not have to prove either harm or causation with "precision." The Estate must prove its overall case only by a preponderance of the evidence, and its experts may express opinions if they can do so with reasonable medical certainty. See In re Custody of C.C.M., 149 Wash.App. 184, 202, 202 P.3d 971 (2009) (preponderance standard applies in civil actions for damages); Bruns, 77 Wash.App. at 215, 890 P.2d 469 (more probable than not standard does not require absolute certainty).
¶ 41 Any differences in opinion between experts go to the weight and not to the admissibility of such testimony. In re Det. of Campbell, 139 Wash.2d 341, 358, 986 P.2d 771 (1999). As with any other type of evidence, the trier of fact is not required to accept an expert's opinions; rather, it decides an issue based on its own fair judgment, assisted by experts' testimony. In re Marriage of Pilant, 42 Wash.App. 173, 178, 709 P.2d 1241 (1985) (citing Richey & Gilbert Co. v. Nw. Natural Gas Corp., 16 Wash.2d 631, 649-50, 134 P.2d 444 (1943)); 5B Tegland, supra § 702.50. The trier of fact may weigh contrary opinions and draw its own reasonable inferences from conflicting evidence. Harrison v. Whitt, 40 Wash.App. 175, 178-79, 698 P.2d 87 (1985); 5B Tegland, supra § 702.50. We reject Stonebridge's argument that the law requires greater precision or scientific certainty than the Estate has shown here.
*1251 ¶ 42 As the Estate argued, the proposed testimony on rape trauma syndrome was aimed at explaining that a person with dementia is not incapable of experiencing trauma following a rape. This testimony was beyond the experience and knowledge of the average layperson and was admissible under ER 702.

II. Implicit Memory/Conditioned Fear Response
¶ 43 The Estate argues that the trial court also erred in excluding Dr. Burgess's testimony regarding implicit memory and "conditioned fear response." Br. of Appellant at 2. We agree. Having concluded that rape trauma syndrome testimony is admissible here without resort to the Frye standard, we need not address the admissibility of the related concepts of implicit memory and conditioned fear response under Frye, particularly where Stonebridge does not argue that these concepts are not generally accepted by the psychiatric community. We do consider, however, whether the scientific theories of implicit memory systems and conditioned fear response would "assist the trier of fact to understand the evidence or to determine a fact in issue." ER 702.
¶ 44 At trial, the Estate will seek to establish that Carlton displayed distressed behavior during the year after the rape and that the rape caused the distress. The Estate's theory is that Carlton formed an implicit memory of the rape and that her distress reactions were conditioned fear responses to stimuli connected in her implicit memory with the rape. Counsel argued that "every time they changed her ... every time she received pericare ... till the day she died, she experienced the distress, the fear" associated with the rape. RP (May 14, 2007) at 123. The scientific principles underlying this theory involve technical knowledge of several parts of the brain, their relative functions, and the effect of progressive dementia on the brain. These topics are beyond the range of the typical layperson's knowledge and experience. Accordingly, expert testimony explaining the concepts of implicit memory and conditioned fear responses will assist the jury in deciding whether the rape caused some or all of Carlton's symptoms; the trial court abused its discretion in ruling such evidence inadmissible.
¶ 45 In conclusion, we hold that Dr. Burgess[7] can testify about rape trauma syndrome as a therapeutic tool, including the recovery phases. She can also testify about the symptoms rape victims commonly experience, and whether Carlton exhibited any of the same symptoms. Finally, she can express her opinion, if she can do so with reasonable medical certainty, as to whether the rape caused any of Carlton's symptoms.

III. Attorney Fees & Costs
¶ 46 The Estate requests fees and costs under RCW 74.34.200(3), which provides that "[i]n an action brought under this section, a prevailing plaintiff shall be awarded his or her actual damages, together with the costs of the suit, including a reasonable attorney's fee." Br. of Appellant at 22. Although the Estate has prevailed in this appeal, it is not yet the "prevailing plaintiff" in the action. If the Estate does ultimately prevail, the trial court may award the Estate its fees from this appeal. It would be premature for us to do so now.
¶ 47 Reversed.
¶ We concur: HOUGHTON, P.J., and BRIDGEWATER, J.
NOTES
[1] The American Psychiatric Association publishes the Diagnostic and Statistical Manual of Mental Disorders (DSM), a compilation of mental disorders that "`reflect[s] a consensus of current formulations of evolving knowledge' in the mental health field." State v. Klein, 156 Wash.2d 103, 117, 124 P.3d 644 (2005) (quoting State v. Greene, 139 Wash.2d 64, 71, 984 P.2d 1024 (1999) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual Of Mental Disorders: DSM-IVTR at xxvii (4th rev. ed.2000))).
[2] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[3] See Doe v. Roe, 191 Ariz. 313, 319 n. 3, 955 P.2d 951 (1998).
[4] These descriptions are not in the record because of the procedural posture of the case.
[5] Brett C. Trowbridge, The Admissibility of Expert Testimony in Washington on Post Traumatic Stress Disorder and Related Trauma Syndromes: Avoiding the Battle of the Experts by Restoring the Use of Objective Psychological Testimony in the Courtroom, 27 Seattle U.L.Rev. 453, 454 (2003).
[6] This may have been a reference to Frye, which addressed the admissibility of a "systolic blood pressure deception test." Frye, 293 F. 1013.
[7] We refer only to Dr. Burgess for ease of discussion. The Estate can offer the same evidence by any qualified expert.