# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

HU YAN, individually and as Personal
Representative of the Estate of GUIZHEN
YAO, deceased,

    Appellant/Cross Respondent,

    v.

PLEASANT DAY ADULT FAMILY HOME,
INC., P.S., a domestic corporation, YU
CHEN YIN and unknown JOHN DOES,

    Respondents/Cross Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 68976-2-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: December 16, 2013

APPELWICK, J. — Yao died after falling during her stay at a private adult family home, Pleasant Day, run by Yin. Yao's husband, Yan, sued Yin and Pleasant Day for negligence, neglect of a vulnerable adult, and breach of contract. Yin asserted that Yao's family, the DSHS, and Yao's healthcare providers were comparatively negligent in causing her death. The jury returned a defense verdict. Yan challenges allowance of the affirmative "empty chair" defenses, the allowance of expert testimony, failure of health care providers to report neglect, and dismissal of his breach of contract claim. We affirm.

## FACTS

Guizhen Yao suffered from Parkinson's disease and a rare form of frontal lobe dementia. The Department of Social and Health Services (DSHS) provided an in-home caregiver for her three hours each day. However, by 2008, Yao's symptoms included recurring panic attacks, hallucinations, delusions, irritability, aggravation, stumbling, fear of falling, and violent, exit-seeking behavior. Her elderly husband, Hu Yan, could no longer care for her due to his own frail condition.

In late spring 2008, Yao's husband and daughter, Janney Gwo, met with Yao's primary care provider, Advanced Registered Nurse Practitioner (ARNP) Eleanor Lee, to discuss placement options for Yao. Lee believed Yao required a level of care that could be provided only at a skilled nursing facility. Yao's doctor, Soo Borson, also recommended that Yao be placed in a skilled nursing home, preferably one with a locked dementia unit. Skilled nursing facilities provide 24-hour care by licensed staff, while adult family homes typically have only one or two caregivers who provide more limited care.

On June 4, 2008, DSHS case manager Debbie Ho prepared a significant change assessment for Yao's transfer to a care facility. The assessment did not disclose Yao's discharge from adult day care for behavioral issues, that another skilled nursing facility rejected Yao, or that her doctors recommended she be placed in a skilled nursing facility.

Lee also prepared a letter on June 8, 2008 outlining Yao's treatment and care needs. She emphasized the complexity of Yao's medical conditions and the behavioral issues the facility would have to address. She recommended that Yao be placed in a "very skillful adult family home who is comfortable managing dementia with extremely difficult behaviors, or a skilled nursing facility with plenty of experienced staff." Lee faxed the letter to Ho on June 11, 2008, intending it to be delivered to the facility selected by Yao's family.

In late June 2008, Gwo and Yan met with Yu Chen Yin, owner of Pleasant Day Adult Family Home and primary caregiver for the facility.[1] Pleasant Day is privately run and Yin is authorized to have up to six residents at one time. Yao's family expressed interest in Pleasant Day, because Yin speaks Chinese. Before admitting Yao as a resident, Yin reviewed a copy of the DSHS assessment of Yao's medical condition. However, neither Yao's family nor DSHS gave Lee's letter to Yin. Nor did Yin know of Yao's exit-seeking behavior.

During June 2008, Lee advised Yao's family several times against placing Yao at Pleasant Day, insisting she go to a skilled nursing facility. However, Yao's family made the ultimate decision to place her at Pleasant Day. Gwo signed the required forms for Yao to be admitted at Pleasant Day and affirmed that she was Yao's representative. Yao appointed Gwo and Yan to be her healthcare agents.

Yao moved in to Pleasant Day on July 7, 2008. That same day, Yao had a severe panic attack and Yin wrote in her chart notes, "'Can't keep Yao's safety.'" Lee visited Pleasant Day the next day to discuss ways to handle Yao's panic attacks. Yin expressed concern that the placement was not a good fit, because Yao's condition was too severe for an adult family home setting. However, Lee told Yin that Yao might need two weeks to get used to the new environment, attributing her behavior to transfer trauma. Yin also asked Yao's family to move her to another facility, but they did not do so.

---

[1] Lee wrote that Yin had one helper from 7 a.m. to 7 p.m., but otherwise did the rest of the work at Pleasant Day.

Yao fell for the first time on the morning of July 19 or July 20. Later that day, Yao escaped from Pleasant Day and fell again. Yin reported these falls to Lee and Yao's family. Lee visited again on July 21. She provided Yin a copy of her June 8 letter and medication log. Yin stressed that Yao needed more supervision and her medical condition was beyond Pleasant Day's capabilities. Lee told Yin that Yao still needed more time to adjust to the new environment.

On August 1, August 16, and August 20, Yao again sustained falls inside and outside Pleasant Day. She suffered multiple injuries to her face and body as a result. After the August 1 fall, Lee visited and acknowledged that Yao should be transferred to a skilled nursing facility.

On August 5, Yin called Gwo to tell her the family needed to move Yao out of Pleasant Day as soon as possible, because she could not keep Yao safe. Yao's medical team met that same day to discuss Yao's care and voiced concern about her actively deteriorating medical condition. They thought an adult family home placement was inappropriate, but were unwilling to place her in the hospital until a bed became available in a skilled nursing facility. No one passed these concerns on to Yin. Rather, they informed her only that Yao was waitlisted for a skilled nursing facility and she needed to stay at Pleasant Day until a bed opened.

Then, on August 30, 2008, Yao escaped from Pleasant Day and fell again, this time fracturing her jaw. Yin called Yao's family, who took her to the hospital. Yao died in the hospital on September 14, 2008 as a result of her injuries from the fall.

Yan sued Pleasant Day and Yin for negligence, neglect of a vulnerable adult, and breach of contract resulting in personal injury and wrongful death. The trial court

dismissed Yan's breach of contract claim on Yin's motion. The parties filed several other motions in limine, only a few of which are pertinent to this appeal, and are addressed in turn below. At trial, Yin argued that Yao's family, DSHS, and Yao's healthcare providers were empty chair defendants, comparatively negligent for Yao's injury and death. The jury returned a defense verdict. Yan appeals.

## DISCUSSION

Yan makes several arguments on appeal. He contends that the trial court erred in denying his motion to strike Yin's empty chair and comparative negligence affirmative defenses. He argues that the trial court abused its discretion in admitting expert testimony that Yin's conduct and care provided to Yao did not constitute neglect. Similarly, Yan argues that the trial court erred in denying his motion to exclude evidence that Yao's healthcare providers and a DSHS investigator did not find or report neglect. He asserts that the trial court erred in dismissing his breach of contract claim. Yin also cross appeals and argues that the trial court erred as a matter of law in limiting her CR 68 costs award to expenses allowed in RCW 4.48.010.

## I. Yin's Affirmative Defenses

Yan argues that the trial court erred in denying his motion to dismiss Yin's empty chair and comparative negligence affirmative defenses to the negligence claim. The alleged empty chairs were DSHS, Gwo, and Yan.[2] There are two issues on appeal: (1) Did DSHS have a special relationship with Yao and thereby owe a duty to protect her

---

[2] Yin also asserted an empty chair defense against ARNP Lee. Though Yan assigns error to Yao's "healthcare providers" as empty chairs, he makes no argument to that effect so we need not consider it. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

5

safety? and (2) Did Yan and Gwo, as Yao's healthcare agents, owe her a duty to provide accurate information about her condition for the purpose of placing her in an appropriate care facility? Yan argues that neither DSHS nor Yao's family owed any such duty, because they had no control over Yin and no custody or control over Yao while she was at Pleasant Day. Whether a duty exists is a question of law we review de novo. Sheikh v. Choe, 156 Wn.2d 441, 448, 128 P.3d 574 (2006).

### A. DSHS as an Empty Chair

Whether DSHS owed Yao a duty turns on whether DSHS had a special relationship with Yao. Under the public duty doctrine, the government may be held liable in tort only if it breaches a duty owed to a particular individual, rather than a duty owed to the general public. Osborn v. Mason County, 157 Wn.2d 18, 27, 134 P.3d 197 (2006). One of four exceptions to the doctrine is the special relationship exception. Cummins v. Lewis County, 156 Wn.2d 844, 853-54, 133 P.3d 459 (2006). A special relationship exists when: (1) there is direct contact or privity between the public official and the injured plaintiff that sets the latter apart from the general public, (2) there are express assurances given by the public official, which (3) give rise to the plaintiff's justifiable reliance on those assurances. Id. Express assurances occur only when an individual makes a direct inquiry and the government clearly sets forth incorrect information, the government intends that the individual rely on this information, and the individual relies on it to his or her detriment. Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 789, 30 P.3d 1261 (2001).

A second special relationship exception derives from the Restatement (Second) of Torts § 315 (1965), which provides:

> "There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> "(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Donohoe v. State, 135 Wn. App. 824, 836, 142 P.3d 654 (2006) (quoting RESTATEMENT (SECOND) OF TORTS § 315 (1965)). In other words, only when there is an established special relationship between the defendant and the plaintiff has the defendant generally been held to owe a duty to protect the plaintiff from foreseeable harm by a third party. Id. at 837.

Yan argues there was no special relationship here, because DSHS did not assist Yao's family in deciding where to place her and Yao's family did not rely on DSHS. Yan also points out that Yin had no contact with DSHS prior to Yao becoming a resident at Pleasant Day. Yin counters, however, that there was direct contact between Yao and her DSHS case manager, Debbie Ho. Ho met with Yao and her family to assess the level of care Yao needed, which Yin argues created a duty to Yao personally. Yin contends that Ho's incomplete assessment of Yao's medical condition was an express assurance that Yin justifiably relied on in admitting Yao to Pleasant Day. Thus, Yin argues, Ho breached her duty to provide an accurate assessment of Yao's medical conditions and ensure Yao's safe placement.

7

Analysis of two particular cases is useful here: <u>Caulfield v. Kitsap County</u>, 108 Wn. App. 242, 29 P.3d 738 (2001), and <u>Donohoe</u>, 135 Wn. App. 824. In <u>Caulfield</u>, the court held that the special relationship exception applied when DSHS and Kitsap County undertook in-home care management for Jay Caulfield, a profoundly disabled, vulnerable adult with multiple sclerosis. 108 Wn. App. at 245. A designated DSHS caseworker initially monitored Caulfield in a nursing home. <u>Id.</u> at 246. DSHS then contracted directly with James Sellars to provide personal, in-home care for Caulfield so he could return home. <u>Id.</u> But, Caulfield's DSHS caseworker failed to meet with him for over a month after his transfer home. <u>Id.</u> When the caseworker finally did so, she found that Caulfield's condition had substantially deteriorated in Sellars's care. <u>Id.</u> She transferred his case to a county caseworker for more intensive case management. <u>Id.</u> However, the county caseworker never reassessed Caulfield's condition and never had any contact with Caulfield. <u>Id.</u> at 247. Caulfield's inadequate care continued unnoticed and unabated until he was finally admitted into the emergency room with pneumonia, malnourishment, weight loss, severe bed sores, and other critical ailments. <u>Id.</u>

Caulfield sued DSHS and Kitsap County for negligently managing Sellars's in-home care. <u>Id.</u> at 245, 247. The appellate court held that the first type of special relationship applied to DSHS, because (1) there was direct contact between DSHS and Caulfield, (2) Caulfield's DSHS caseworker gave express assurances regarding case management and crisis intervention, which (3) gave rise to Caulfield's justifiable reliance through his acceptance of the case manager's detailed duties. <u>Id.</u> at 252. The court also held that the county's actions established the second type of special relationship exception. <u>Id.</u> at 256. The county case manager had a duty to use reasonable care,

because Caulfield's inability to care for himself left him completely dependent on his caregivers and case managers for his personal safety. Id.

The appellate court subsequently distinguished these facts in Donohoe. Like Caulfield, Florence Donohoe was a vulnerable adult in need of 24-hour care, which the adult family home where she lived was unable to provide. 135 Wn. App. at 829. A DSHS case manager conducted a comprehensive assessment to determine Donohoe's required level of care and Medicaid eligibility. Id. at 829. The case manager told Donohoe's family that she needed to be placed in a nursing home. Id. Her family then made the ultimate decision to place her with Pacific Care Center, a privately owned nursing home. Id. at 829, 840. Pacific Care employed, supervised, and monitored Donohoe's multiple health care providers. Id. at 840. Unlike Caulfield's government-supervised care, DSHS was not responsible for Donohoe's care at the nursing home and did not oversee her treatment there. Id. at 840, 842. Caulfield relied solely on his caseworkers to handle his care. Id. at 840. In contrast, Donohoe's DSHS caseworker was responsible only for determining her Medicaid eligibility, assessing the level of care she needed based on her medical conditions, and assuring the necessary funding for that care. Id. at 829, 840. The appellate court held that this was insufficient to create a special relationship between DSHS and Donohoe. Id. at 844.

Donohoe controls here. Donohoe's case manager had direct contact with her in assessing her medical condition, just like Ho's assessment of Yao. Under Donohoe, however, DSHS's assessment of a vulnerable adult's condition does not give rise to a special relationship. And, like in Donohoe, Yao's family, not DSHS, made the ultimate decision to place Yao at Pleasant Day, a private adult family home. Yin's individual

9

care of Yao is more similar to Sellars's oversight of Caulfield than the group nursing home in Donohoe. However, unlike Caulfield, DSHS did not directly oversee Yin's conduct and care of Yao. Yin, not DSHS, was responsible for Yao's individual daily care at Pleasant Day. Yao relied on Yin for her safety and well-being. Moreover, Yin does not point to any express assurances that DSHS made to Yao, which is necessary to establish a special relationship with her. Because Yao's family placed her in a private adult family home and Yin oversaw her care, DSHS did not have a special relationship with Yao. Therefore, DSHS owed no duty to Yao as a matter of law and was not a proper empty chair defendant.

However, we must consider whether the trial court's refusal to strike DSHS as an empty chair was nevertheless harmless error. We will not consider an error to be prejudicial unless it affects, or presumptively affects, the outcome of the trial. Thomas v. French, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).

The jury was instructed:

> Instruction No. 10: As to plaintiff's cause of action for negligence, the plaintiff has the burden of proving each of the following propositions: First, that the defendants acted or failed to act in one of the ways claimed by the plaintiff; and that in so acting or failing to act, the defendants were negligent. Second, that the plaintiff's decedent was injured and died. Third, that the negligence of the defendants was a proximate cause of the injury to the -- of the injury to the death of Guizhen Yao and damage to the plaintiff.

> If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff on the claim for negligence. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendants on the claim for negligence.

> . . . .

10

Instruction No. 15: There may be more than one proximate cause of the same injury or event. If you find the defendants negligent and that such negligence was a proximate cause of injury or damage to the plaintiff, it is not a defense that the act of some other person who is not a party to this lawsuit may also have been a proximate cause. However, if you find that the sole proximate cause of injury or damage to the plaintiff was the act of some other person who was not a party to this lawsuit, then your verdict should be for the defendants.

We presume that the jury followed the trial court's instructions. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). The jury returned the special verdict form answering, "No" to whether Yin and Pleasant Day were negligent.[3] Based on the jury instructions, this means that Yan failed to prove one or more of the required elements for his negligence claim. Yan's negligence claim failed, then, regardless of whether DSHS was an empty chair or not. Because the DSHS empty chair defense did not affect the outcome of trial, the error was harmless.

## B. Yao's Family's Comparative Negligence

Yan argues that no Washington case law requires that family members protect another adult family member from the negligence and neglectful acts of a third party. Yan contends that imposing a duty upon every family that places an adult family member in a nursing home or adult family home is too far-reaching and should be left to the legislature.

As discussed above, there is no general duty to prevent a third person from causing physical harm to another unless a special relationship "'exists between the actor and the other which gives to the other a right to protection.'" Donohoe, 135 Wn. App. at 836 (emphasis omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 315

---

[3] The special verdict form then instructed the jurors to skip to question 10 and not answer whether Yao's family, Lee, or DSHS were also negligent.

11

(1965)). In cases imposing a duty based on this type of special relationship, courts have found that the relationship involved an element of entrustment. Webstad v. Stortini, 83 Wn. App. 857, 869, 924 P.2d 940 (1996). In other words, one party was in some way entrusted with the well-being of the other party. Id.

No longer able to care for herself, Yao authorized Gwo and Yan to be her healthcare agents and give informed consent for her medical treatment. RCW 7.70.065(1)(a). Merely placing a family member in a nursing home may not create a special relationship. But, here Gwo and Yan were entrusted with Yao's safety and medical decisions as her healthcare agents, thereby creating a special relationship. Yao's family owed a duty to protect her from harm caused by a third party. Additionally, as Yao's healthcare agents, Gwo and Yan stepped into Yao's shoes. Any decisions Gwo and Yan made on Yao's behalf have the "same effect . . . and bind the principal . . . as if the principal were alive, competent, and not disabled." RCW 11.94.010. Indeed, the jury was instructed that "[a]n act or omission of an agent within the scope of authority is the act or omission of the principal." The jury could then properly consider whether Gwo and Yan acted reasonably to care for Yao's safety. Rosendahl v. Lesourd Methodist Church, 68 Wn.2d 180, 182, 412 P.2d 109 (1966). The trial court did not err in allowing Yin to assert an affirmative defense of Gwo and Yan's comparative negligence.

II. Expert Opinions on Neglect

Yan argues that the trial court abused its discretion in admitting expert opinions that Yin's conduct and care of Yao did not constitute neglect, even though neglect of a vulnerable adult was one of Yan's causes of action. Before trial, Yan moved to exclude

all expert opinions as to whether Yin's conduct and care of Yao was negligent or neglectful. Yan argued that such testimony is inadmissible, because it would amount to conclusions of law. The trial court granted Yan's motion as to negligence, but denied his motion as to neglect.

RCW 74.34.200(1) creates a cause of action for neglect of a vulnerable adult by an adult care facility. RCW 74.34.020(12) defines neglect as:

> (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

At trial, Katherine Ander explained that during her 13 years working for DSHS, she investigated about 150 complaints of neglect every year. On February 10, 2009, after Yao's death, Ander investigated Pleasant Day to determine if Yin's conduct constituted neglect. She testified at trial that she "did not find that it met the standard of neglect." Ander further opined:

> So when I look at that definition of neglect for the RCW, you first establish does the person have a duty to care. In this case, yes, the provider did have a duty to care. And then you look, is there a pattern of action or inaction that failed to maintain the resident's well-being or an omission that was just grossly negligent of their welfare.
>
> When I looked at what her actions were and the pattern of her action, even though she didn't act in the way that would have benefitted this resident, I couldn't find -- make a finding of negligent because she did do a lot of things. In fact, I listed them in my statement of deficiency. I listed all of the things she did. She did, you know, try to stop her from going out the door. She was calling Eleanor Lee on a regular basis. She did talk to the family. She did try to contact the DSHS case worker.

Yin's expert Elizabeth Johnston was also asked to investigate whether Yin "met the standard of care of a reasonably prudent adult family home and caregiver under the same or similar circumstances," and whether she thought there was evidence of neglect. Johnston testified that, based on her experience and education, she did "not see neglect in this case." She explained:

> The definition of neglect speaks to a course of conduct or inaction. And what I definitely do not see in this case is a course of conduct or inaction. What I see is Mrs. Yin doing much action, interacting every day, every hour, trying different approaches to try to keep Mrs. Yao safe . . . .
>
> . . . I see lots and lots of action in this case of Mrs. Yin trying to keep Mrs. Yao safe.
>
> The second part of the definition of neglect is a serious disregard for consequences. And I see exactly the opposite . . . .
>
> I see her calling DSHS. I see her talking with the family. I see her talking with Dr. Lee. I see her doing everything she can. Exactly the opposite of a serious disregard for consequences. I do not see neglect here at all.

Yan argues that Ander and Johnston erroneously gave their opinions that Yin's conduct constituted neglect of a vulnerable adult, which was the ultimate issue before the jury. He contends that Ander's testimony was especially prejudicial, because she is a government official with significant experience investigating neglect cases.

ER 704 provides: "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704 applies to all witnesses, both lay and expert. 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 704.2, at 260 (5th ed. 2007). In essence, opinion testimony may be admitted even if it addresses an ultimate issue to be decided by the trier of fact. However, a witness may not express an opinion

14

that is a conclusion of law or merely tells the jury what result to reach. Carlton v. Vancouver Care, LLC, 155 Wn. App. 151, 168, 231 P.3d 1241 (2010). Trial courts have broad discretion in determining admissibility of ultimate issue testimony. City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993). A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. Kappelman v. Lutz, 167 Wn.2d 1, 6, 217 P.3d 286 (2009).

Though legal conclusions like the defendant was negligent are inadmissible, expert opinions that help establish the elements of negligence are admissible. Davis v. Baugh Indus. Contractors, Inc., 159 Wn.2d 413, 420-21, 150 P.3d 545 (2007). Likewise, in medical and legal malpractice actions, qualified experts are often required to testify as to the applicable standard of care and offer opinions on whether the standard of care was violated. Coggle v. Snow, 56 Wn. App. 499, 510, 784 P.2d 554 (1990); Geer v. Tonnon, 137 Wn. App. 838, 851, 155 P.3d 163 (2007). This is so, because the standard of care is often highly technical and beyond the knowledge of the ordinary person. Geer, 137 Wn. App. at 851.

In State v. Nelson, the defendants were convicted of dogfighting. 152 Wn. App. 755, 765, 219 P.3d 100 (2009). The defense at trial was that substantial circumstantial evidence showed only intent to engage in legal weight-pulling contests. Id. at 768. In contrast, the State was allowed to introduce expert testimony that circumstantial evidence showed the defendants engaged in dogfighting and intended to operate a dogfighting exhibition. Id. at 766-67. The appeals court concluded that this was a fair summary and opinion of the significance of the State's evidence. Id. at 768. Each piece of evidence taken in isolation would not lead to the conclusion that there was a

dogfighting operation. Id. The trial court reasonably assumed that most jurors would be unfamiliar with the world of dogfighting. Id. It was then up to the jury to accept either the defendants' characterization of the evidence or the State's. Id. And, simply because the expert testimony was couched in terms of the statutory elements of dogfighting did not make it inadmissible.[4] Id.

Like in Nelson, both Yan and Yin presented expert testimony as to whether Yin's conduct rose to the level of neglect. Yan's expert, Dr. Sabine von Preyss-Friedman, testified,

> There was a duty to keep the patient safe and to provide those services. And those services would have been either to prevent the wandering and the falling through a process that was realistic or discharge them, and neither of those courses were embarked on. And in that sense, the defendant failed in [her] duty and the outcome was harm. And for that reason I say, yes, this was a vulnerable adult and she was neglected -- neglectfully treated.

Simply because Ander, Johnston, and von Preyss-Friedman couched their testimony in terms of the statutory definition of neglect does not make that testimony inadmissible. Unlike the ultimate issue of negligence, that requires a conclusion of law, whether Yin's conduct constituted neglect is a factual conclusion based on her actions and inaction. It is more akin to the question of whether Yin's conduct violated a standard of care. This is what the experts testified to. And, this testimony was useful to the jury, because the statutory definition of neglect is complex and likely unfamiliar to an ordinary person. Both parties characterized Yin's conduct and offered their ultimate opinion of fact that it

---

[4] "Washington law favors resolution of issues on the merits. It should not be fatal to a party's claim or defense that an expert used legal jargon, so long as an appropriate foundation for the conclusion can be gleaned from the testimony." Davis, 159 Wn.2d at 420-21.

either did or did not constitute neglect. The jury could then decide which characterization of the evidence to accept. We hold that the trial court did not abuse its discretion in allowing experts to testify about neglect.

Yan also argues that Ander erroneously changed the neglect standard to a gross negligence standard. However, Yan did not object to this testimony at trial and makes no showing of how this testimony prejudiced his case. The jury was also instructed on the proper standard for neglect of a vulnerable adult. Because we presume that jurors follow the court's instructions, any error was harmless.

III.    Healthcare Providers Not Reporting Neglect

Before trial, the trial court also denied Yan's motion to exclude defense witnesses from testifying that Yao's healthcare providers and DSHS did not report neglect. At trial, Yin questioned Yao's healthcare providers, ARNP Lee and Dr. Borson, as well as Ander about not reporting neglect. Lee testified that she was required by law to report if Yao was in danger, abused, or neglected, but she made no such reports. Borson also opined that she had no suspicion of abuse or neglect, and would not have reported Yin's facility to the State based on what she knew on August 5, 2008. Likewise, Ander testified that she did not find any reports of neglect in the case file.

Yan contends that the trial court should not have allowed this testimony, because failure to report neglect does not mean that a witness or doctor did not believe neglect occurred. However, as healthcare providers, Lee and Borson are mandatory reporters. This means they are required by law to report suspected abuse or neglect and are subject to criminal penalties for failing to do so. RCW 74.34.035, .053. Therefore, not reporting neglect arguably indicates that Lee and Borson did not observe neglect, which

17

is relevant to whether neglect occurred. Yan further argues that implying no neglect is tantamount to giving an opinion that Yin's conduct was not neglectful. However, such testimony goes to an ultimate issue of fact, which is admissible under ER 704.[5] We find no abuse of discretion in allowing the challenged testimony.

IV.   Breach of Contract Claim

In his second amended complaint, Yan alleged that he and his family entered into a contract with Yin to hire an extra caregiver for Yao in exchange for an additional $500 per month. Yin never hired an extra caregiver. Yan alleged that Yao died and he sustained damages as a result of this breach of contract. Before trial, Yin moved to dismiss this claim, arguing that Yan could not recover damages for personal injury or death under a breach of contract claim. The trial court granted the motion to dismiss. Yan argues this was error, because emotional damages should be recoverable for breaching a personal services contract like the one here.

The law of contracts is designed to enforce expectations created by agreement, while the law of torts is designed to protect citizens and their property by imposing a duty of reasonable care on others. Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 821, 881 P.2d 986 (1994). Therefore, tort damages for emotional distress caused by breach of contract are traditionally not recoverable. Gaglidari v. Denny's Restaurants, Inc., 117 Wn.2d 426, 440, 815 P.2d 1362 (1991). The Gaglidari court recognized an exception to this rule: "Recovery for emotional

---

[5] Yan cites Billington v. Schaal, pointing out that traffic citations are inadmissible, because they constitute improper opinion evidence about the defendant's guilt. 42 Wn.2d 878, 882, 259 P.2d 634 (1953). However, Billington does not apply here, because testimony regarding whether Yin's conduct constituted neglect was admissible.

disturbance will be excluded unless the breach also caused bodily harm or <u>the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.</u>" <u>Id.</u> at 443 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 353 (1981)).

However, the <u>Gaglidari</u> court went on to emphasize that "by allowing emotional damages whenever they are a foreseeable result of the breach [of contract], the traditional predictability and economic efficiency associated with contract damages would be destroyed." <u>Id.</u> at 446. The court further warned that "[t]he impact of allowing emotional distress damages for breach of contract would indeed be enormous" and would "represent a profound change in the law." <u>Id.</u> at 448. Therefore, "a more prudential approach would be for the Legislature to consider the matter prior to such a change occurring." <u>Id.</u>

Before trial, Yan could not articulate any damages arising from the purported breach of contract other than general emotional distress damages associated with his wrongful death tort claim.[6] Nor does Yan point us to any Washington case that has applied the exception recognized in <u>Gaglidari</u>. We decline to break new ground and allow recovery of emotional distress damages for breach of contract where the same damages are cognizable in tort. We therefore affirm the trial court's dismissal of Yan's breach of contract claim.

---

[6] The court queried: "What are your damages?" To which Yan's attorney replied, "Under contract? I think the damages are the wrongful death and everything else. Everything that happened to this woman when she fell down. I don't believe that an economic loss will even apply in this case." And, Yin repaid the $1000 paid for extra services.

19

V. <u>Cross Appeal: CR 68 Costs Award</u>

In her cross appeal, Yin argues that because she made an offer of judgment before trial, CR 68 provides for recovery of all post-offer costs she incurred. As such, Yin posits, the trial court erred as a matter of law in limiting her recoverable costs to only those enumerated in RCW 4.84.010.

Before trial, Yin served a $250,000 offer of judgment on Yan. After the defense verdict, Yin submitted a cost bill for $12,296.30, which included expenses for depositions and records not used at trial. Yan objected, arguing that Yin's recoverable expenses were limited to those delineated in RCW 4.84.010. The trial court entered judgment for a reduced costs award of $2,256.49, as recommended by Yan.

The standard of review for an award of costs involves a two-step process. <u>Hickok-Knight v. Wal-Mart Stores, Inc.</u>, 170 Wn. App. 279, 325, 284 P.3d 749 (2012), <u>review denied</u>, 176 Wn.2d 1014, 297 P.3d 707 (2013). First, we review de novo whether a statute, contract, or equitable theory authorizes the award. <u>Id.</u> Second, if such authority exists, we review for abuse of discretion the amount of the award. <u>Id.</u>

CR 68 provides for an award of costs to a defendant in cases where the defendant made an offer of judgment to the plaintiff that was larger than the judgment ultimately obtained. <u>Estep v. Hamilton</u>, 148 Wn. App. 246, 259, 201 P.3d 331 (2008). CR 68 specifies: "If the judgment finally obtained by the offeree is not more favorable than the offer, <u>the offeree must pay the costs incurred after the making of the offer.</u>" (Emphasis added.) RCW 4.84.010 provides in part:

> The measure and mode of compensation of attorneys and counselors, shall be left to the agreement, expressed or implied, of the parties, but there shall be allowed to the prevailing party upon the

20

judgment certain sums for the prevailing party's expenses in the action, which allowances are termed costs, including, in addition to costs otherwise authorized by law, the following expenses . . . .

(Emphasis added.) RCW 4.84.010 then enumerates recoverable costs, such as reasonable expenses incurred in obtaining reports and records admitted into evidence at trial, as well as expenses incurred in taking depositions used at trial. Based on the emphasized language above, Yin argues that CR 68 read together with RCW 4.84.010 authorizes an award of all costs incurred after an offer of judgment—above and beyond those allowed in RCW 4.84.010. Yin is wrong.

As both parties acknowledge, CR 68 is a cost-shifting device. Magnussen v. Tawney, 109 Wn. App. 272, 275, 34 P.3d 899 (2001). If the defendant does not make an offer of judgment, the plaintiff is the prevailing party if there is any judgment in its favor. By making an offer of judgment, the defendant sets the bar higher for what judgment the plaintiff must obtain to become the prevailing party. Therefore, CR 68 shifts who is considered the prevailing party based on the amount of the defendant's offer of judgment. RCW 4.84.010 then delineates the costs recoverable by the prevailing party. In Estep, the defendant moved for a CR 68 costs award based on a settlement offer made before summary judgment. 148 Wn. App. at 255. The court held that costs not permitted under RCW 4.84.010—such as costs for depositions not filed, expert witness fees, and airfare—were not recoverable costs under CR 68. Id. at 261-63. We hold that the trial court properly limited Yin's award to costs allowed in RCW 4.84.010, because CR 68 does not entitle her to additional costs.

Yan requests attorney fees under RAP 18.1, arguing that Yin's cross appeal is frivolous. An appeal is frivolous if there are no debatable issues upon which reasonable

21

minds might differ, and if it is so totally devoid of merit that there was no reasonable possibility of reversal. <u>Tiffany Family Trust Corp. v. City of Kent</u>, 155 Wn.2d 225, 241, 119 P.3d 325 (2005). An appeal that is affirmed simply because the arguments are rejected is not frivolous. <u>Id.</u> Here, Yin cited case law and statutory authority for her argument that CR 68 entitles her to additional costs beyond RCW 4.84.010. While a losing argument, it is a not completely devoid of merit, so we decline to award Yan fees under RAP 18.1.

We affirm.

WE CONCUR: